Wallace *vs.* Tumlin & Stegall.

C. WALLACE, Superintendent Western & Atlantic Railroad, plaintiff in error, *vs.* TUMLIN & STEGALL, defendants in error.

1. Where a suit was pending in a Court of this State against the Superintendent of the Western & Atlantic Railroad, upon the Act of 24th of October, 1870, to authorize the lease of said road, and before said lease was consummated:

*Held*, Under the 8th section of such Act, which provides for the settlement of the liabilities of said road by a Board of Commissioners therein named, *or until* the claim has been verified by a judgment of the Court having jurisdiction of the case, that the Court having jurisdiction of the case may proceed, under such jurisdiction, to a hearing, and by an appeal to this Court, under the rules of law.

2. Where a suit was instituted against the Western & Atlantic Railroad for damages, growing out of a breach of contract, and the declaration alleged that the contract was in writing and had been lost:

*Held, first*, The remedy, under the Code, section 3910, is cumulative, and does not deprive a party of his right to sue at law.

3. Where proof of a loss of an original paper is made before the Court, and he admits secondary proof thereof:

*Held*, Under sections 3714 and 3779 of the Code, questions of diligence in exhausting the means of information for primary evidence, accessible to the party, is one addressed to the sound discretion of the Court below, with which this Court will not interfere, except where it has been flagrantly abused.

4. Where the evidence upon the breach of contract exhibits the fact that the plaintiff was to receive a certain price, and the amount necessary for the performance, after such alleged breach, is a matter of fixed computation, and the Court charged the jury on the measure of damages that plaintiff was entitled to recover the whole amount sued for, less what would have been his expenses in performing the contract:

*Held,* That the actual damages which the plaintiff was entitled to recover, embraces the difference between the cost of doing the work and the price to be paid for it.   The law requires the utmost good faith in relation to contracts, and where parties refuse to carry out contracts into which they have entered, the party injured may pursue his remedy for damages, and the measure of the damages for such breach or refusal to carry out the contract will be computed by ascertaining the profits of the enterprise, after deducting the legitimate and actual costs of its execution; and, in the view we entertain of the law of this case, the charge of the Court below was error.

5. When a motion is made for a new trial, on the grounds of newly discovered evidence, in the discovery of a letter, testified to as the contract of the parties, and such letter referred to matters of defense proven on the trial:

*Held first,* That applications for new trial on this ground, and the question of diligence and materiality, and whether it is cumulative only or goes to the impeachment of a witness, and whether it would have changed the result, will be closely, if not critically, scanned by the Court:

*Held again,* Where the newly discovered evidence is reconcilable with the other proof in the case, or if there appears, on the whole, sufficient evidence to support the verdict, the Court will not grant a new trial, especially where the Court below has violated no rule of law in submitting the case to the jury, and there is sufficient evidence to support it, and he has refused a new trial.

6. Judgment affirmed, with instructions to deduct from the amount o f the verdict $2 00 per month, with the interest thereon for three years.

Effect of Repeal.   Western & Atlantic Railroad.   Secondary Evidence.   Measure of Damages.   Profits.   New Trial.   Cumulative Evidence.   Before Judge HOPKINS.   Fulton Superior Court.   November Term, 1870.

In August, 1867, Tumlin & Stegall averred that, on the 1st of December, 1857, Spullock, then Superintendent of the Western & Atlantic Railroad, in his official capacity as such, employed them to supply with water a tank, at Shanghai

station, on said road, for five years from the completion of the necessary works therefor, to-wit: An hydraulic ram, pipes and fixtures, all to be furnished by plaintiffs, for which Spullock, as Superintendent, agreed to pay them $1 00 per day, payments to be made per month; that they erected said works at a cost of $700 00, which were sufficient to perform the service for five years, and on the 1st of March, 1858, began to supply water, and continued so to do till March, 1860, when defendant discontinued the use of said tank and tore it down. Because they were ready to go on and were prohibited by defendant, they claimed pay, at said rate, for the whole time. They averred that this contract was in writing, but had been lost, that the defendant refused to pay on demand, etc. The defendant pleaded the general issue and Statute of Limitations, four years. The defendant's counsel moved to dismiss the suit, because it was based upon a lost instrument, which had not been established according to the statute for such cases provided. This motion was overruled.

Plaintiffs introduced evidence as follows:

LEWIS TUMLIN, one of the plaintiffs, testified as follows: In 1857 or 1858, Tumlin & Stegall, through me, made a contract with James M. Spullock, then the Superintendent of the Western & Atlantic Railroad. Said contract was reduced to writing, and signed. I had the writing in my possession, and afterwards (perhaps about 1861)—but I do not remember the year exactly—handed it to Hawkins F. Price, one of the members of a legislative committee appointed to investigate the affairs of the Western & Atlantic Railroad. He received it as a member of the committee, and not as a private individual. A copy of said contract was subsequently included in the printed report of said committee. The original is not now in my possession, and I know not where it is. I believe it to be lost. Have never seen it since I handed it to Price. I have inquired of Price for it several times, and he answered that he did not have it, and did not know what had become of it. Have not inquired of any other

Wallace *vs.* Tumlin & Stegall.

member of the committee, nor at any office in the State-House, nor had any search made among the papers of the Legislature.   Have mentioned it to Campbell Wallace while he was Superintendent, who could neither find the original nor one of the reports containing a copy.   He said he would get a copy of the report, if possible, but stated afterwards that none could be found, or that he had failed to find any. My impression is that Price was the person to whom I gave the writing—that is my best recollection.   He was from my own county, (Bartow) and was on the committee.   The contract, as agreed on and set out in the writing, was this: Tumlin & Stegall were to lay down pipes, etc., and keep up a running stream of water at Shanghai Station on the Railroad for the term of five years, for which the road was to pay them one dollar a day for the whole term, Sundays included, the days of each month to be paid for at the end of each month.

The plaintiffs went on to perform their part of the contract.   They bought a piece of land with a good spring upon it, and by means of pipes carried the water from said spring to the station, about a hundred and fifty yards, and kept up a running stream for something like two years.   The stream was still running when the tank was pulled down by the authorities of the road, and the plaintiffs were ready and willing to have kept it running from that time to the end of the five years.   The works as then existing were apparently sufficient, without other expense than the wages paid Mrs. Reeves for attending to them, to supply the stream for the whole term.   The plaintiffs paid Mrs. Reeves about two dollars per month.   Her business was to see that no trash washed into the pipes, and that the stream was kept running. She was employed and attended to the business as long as the tank stood and the road would use the water.   The plaintiffs gave no consent to the act of the road in taking down the tank and ceasing to receive water.

The land purchased was either ten or forty acres, I do not

remember which, and was of value only for the spring and for this purpose. It was not wanted by the plaintiffs for any other purpose, and would not have been bought by them if this contract for supplying water had not been made. It is still their property, but they have no use for it. My recollection is that it cost $100 00 or $200 00, but Stegall thinks it cost $250 00, and perhaps he is more likely to be correct, as he gave more attention to executing the contract than I did. Indeed, the whole matter of erecting the necessary works was under his charge, and I do not recollect that I was ever at the spring after the work was finished. I do not know whether any rams for elevating the water were put up there or not. The whole expense to the plaintiffs of starting the water to run, according to contract, including cost of the land, was $600 00 or $700 00. So I think, from my best recollection, and in view of this expense, I *thought* the contract rather a hard one. The pipes were of cast iron, and are all there yet, as they were placed in the ground when the work was first done.

I have never received one cent under said contract. Money to pay us was sent up the road several times, as I understand, but only at the rate of $20 00 a month. I would not receive it, because not enough, according to contract, and I gave strict orders to Stegall not to receive it. Whilst Dr. Lewis was Superintendent of the road, I conversed with him several times in regard to paying us. He refused to pay more than $20 00 per month, saying that Spullock had agreed to pay too much. He admitted that the water ran in a beautiful stream. The written contract was then in my possession, but I did not show it to him, so far as I now recollect.

This evidence of the contents of the writing came in over objection of defendant's counsel, upon the ground that the loss of the original was not sufficiently shown.

Stegall testified the same, in substance, as to performance, and that nothing was paid to him. Spullock testified to the

contract substantially as Tumlin did.   Mr. and Mrs. Reeves testified to keeping up the supply of water as averred, so long as defendants would receive it.   Demand and refusal of settlement before suit being shown, plaintiffs closed.

Defendant's counsel read the interrogatories of Dooly, Supervisor of the road, to show that such contract was not made, and that plaintiff had been paid something for such work, and closed.   The Court then charged the jury, among other things not excepted to, as follows:

"In this case the plaintiffs do not seek to recover damages for any breach of the contract, except the alleged breach by non-payment of the whole sum sued for, and no other breach can be recovered for.

"They can, however, recover the whole amount sued for, less what would have been their expenses in keeping the water running from the time the road ceased to use it until the end of the term contracted for, and less, also, the payments made to them, if any, provided they have proved the contract as alleged, and the facts of the case are, substantially, as set out in the declaration.   The parties, as witnesses, are entitled to full credit, as other witnesses, unless they have been impeached or discredited."

The jury found for plaintiffs for $1,825 00, principal and $1,046 35 interest, up to 25th November, 1869.

Defendant's counsel moved for a new trial, upon the grounds, that the Court erred in refusing to dismiss said cause; in allowing the contents of said writing proved, and in each clause of said charge; and because the verdict was contrary to law, etc., and for certain newly discovered evidence.   That evidence was produced with an affidavit, as follows:

"I, P. L. MYNATT, attorney for the defendant, do swear, that since the trial of the case, I have discovered a report of a Senate committee of the State of Georgia, of which Hawkins F. Price seems to have been a member, in the year 1858; that it is the only Senate committee I have been able

to hear of, after diligent search and inquiry, of which Hawkins F. Price was a member; that in the proceedings of said committee, I find, on pages 35, 36, 37, 38 and 39 of the pamphlet, which I ask to be considered in connection with this affidavit, a report or review of the dealings of the plaintiffs with Spullock, formerly Superintendent of the road, and, among the rest, what purports to be a copy of a contract between the plaintiffs and Superintendent Spullock, reduced to writing after Spullock left the road. Said contract is in the form of a letter from Spullock to Tumlin, of date, 28th February, 1858. It seems to be treated as the contract by the committee, and affiant supposes it to be the contract alluded to by the witness, Tumlin, as he sees no other in said report. From this writing it seems that Tumlin was to keep up a supply of wood and water at a station between Allatoona and Etowah River, for a term of five years, at customary prices. Affiant had no knowledge of the existence of this report, or of the evidence contained therein, until after the trial, and he thinks it was not known to any officer or agent of the road, as this matter has been under his control and management, and he had made diligent inquiry for anything of the sort; he thinks this evidence would produce a different result, if a new trial were granted."

The printed report tended to throw light upon the following letter, but none of *it* is necessary for our purposes. The discovered letter, as printed in that report, was as follows:

" ROME, February 28, 1858.

"*Colonel Lewis Tumlin:*

" DEAR SIR : Your letter, bearing date 13th instant, has been received. You request me to state what the understanding or contract was between yourself and me, as Superintendent of the Western & Atlantic Railroad, in reference to a wood and water station you agreed to keep up between the Etowah River and Allatoona depot. My recollection is, that you agreed, upon your part, to keep up a supply of wood

and water at the station alluded to, for the term of five years, the road paying you the customary prices for keeping up the station. My recollection is, that you required me to allow you the privilege of keeping up the station for the term of five years, in consequence of some expenditures which you stated would have to be made in order to keep on hand a full supply of water. It appears to me that it will be the interest of the road to keep up the contract with you.

" I hope, therefore, you will have no difficulties with the authorities of the road, growing out of this contract.

"Yours, respectfully,          J. M. SPULLOCK."

The Court refused a new trial, and error is assigned on each of said grounds.

The bill of exceptions was certified on the 19th of December, 1870. During that month, the Western & Atlantic Railroad was leased, by the State, to the Western & Atlantic Railroad Company, in pursuance of an Act of the General Assembly. When the cause was called here, in April, 1870, counsel for defendant in error said this Court was ousted of jurisdiction by said Act, and moved to dismiss the writ of error. This Court held that it could hear the cause.

MYNATT & DELL, for plaintiff in error. As to secondary evidence: 6th Ga. R., 188; 10th, 260; 14th, 413; 2 Par. on B. & N., 305, 306; 1 Phil. on Ev., 470, note; 2d Ib., 480. If original was in hand of third person he must *testify* about: 2 Phil. on Ev., 563, 4, 5, 6, 7. Degrees of secondary evidence: Revised Code, sections 3714, 3715; 2 Phil. on Ev., 533, note, 568. Plaintiffs having performed but part could not recover for the whole: 2 Gr. Ev., 261, 261a; 1 Denio 317; 2 Sm. Lead Cas., 36, 37, 42. Party not entitled to same credit as disinterested witness: Revised Code, section 3820; Brown vs. Reed, this term. Original paper should have been established before suit brought: Revised Code, section 3910; 14th Ga. R., 194.

---

Wallace *vs.* Tumlin & Stegall.

---

L. E. BLECKLEY, for defendant. The writ of error should be dismissed because, statute repealed, Superintendent out of office, and jurisdiction gone: Act 24th October, 1870; R. Code, section 975, par. 8. Superintendent to sue and defend: 19th Ga. R., 543. The Statute means Superintendent literally: Revised Code, section 4192. Only a *party* can except, etc.; 15 Ga. R., 510. Writ dismissed because plaintiff in error dead: 2 Kelly, 248. Officer out of office is officially dead: 3 Kelly, 213. Nature of bill of exceptions: 9th Ga. R., 286. Nature of writ of error: 12th Ga. R., 424. Courts must look to the law for their powers, and exercise power in *manner* prescribed. Jurisdiction withdrawn by repeal: 3 Kelley, 56; 21st Ga. R., 58; 12th, 475; 27th, 467; 1 Watts, 258, 382; 10th, 351; 3 Burr, 1456; 1 W. Blackstone, 451; 4 Yeates, 392; 7 Burr, 173; 1 Hill, 324. Secondary evidence of lost paper: Revised Code, sections 3714, 3716, 3779; 8th Ga. R., 468; 12th, 125; 14th, 252; 21st, 217; 16th, 67; 6th, 196; 7th, 264. Copy need not be established: 12th Ga. R., 509; 30th, 545. Contract sued on admitted because not denied on oath: Revised Code, section 2800; 11th Ga. R., 530. Measure of recovery: Revised Code, sections 2822, 2888, 2893; 8th Ga. R., 190; 18th, 407; 21st, 157; 3 Par. on Con. 187–8–9; 7 Hill, 61; 13 How. R., 344; 2 Curtis, 28. Newly discovered evidence: 10th Ga. R., 527–8; 9th, 4; 13th, 513. Affidavit, etc.: 16th, 33.

LOCHRANE, C. J.

The main question in this case arises upon the charge of the Judge in relation to the rule for the ascertainment of damages. Section 2888 of the Code declares, if a contract be entire, but one suit can be maintained for breach thereof. Where money is to be paid by installments, an action will lie for breach, but all the breaches occurring up to the commencement of the action must be included therein. Section

2893, speaking of the damages which are allowed for breach of contract, includes the profits which are the immediate fruit of the contract. 2d Curtis, C. C., determining what damages plaintiff was entitled to recover, lays down what we conceive to be a reasonable and just principle by which the jury should be governed. " He was entitled," says the Court, " to recover the contract price of the work, deducting the cost of finishing the work." In the case of the Philidelphia & Baltimore Railroad *vs.* Howard, 13th H., 344, it is said : " It is insisted that only actual damages, and not profits were in that event to be allowed by the jury. It must be admitted that actual damages were all that could lawfully be given in action of covenant, even if the company had been guilty of fraud ; but it by no means follows that profits were not to be allowed. Understanding, as we must, the term profits in this instruction as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract, actual damages clearly include the direct and actual loss which the plaintiff sustains *propter rem ipsum non habitam ;* and in case of a contract like this that loss is among other things, the difference between the cost of doing the work and the price to be paid for it. This difference is the inducement and real consideration which causes the contractor to enter into the contract; for this he expends his time, exerts his skill, uses his capital and assumes the risks which attend the enterprise, and to deprive him of it, when the other party has broken the contract and unlawfully put an end to the work, would be unjust. There is no rule of law which requires us to inflict this injustice." The soundness and justice of this principle cannot be controverted. Where parties enter into contracts they must, in good faith, fulfil them; and when they refuse to carry out contracts into which they have entered, the party injured may pursue his remedy for damages, and the measure of the damages for such breach will be computed by ascertaining the profits of the enterprise, after deducting the legitimate cost of its execution.

Another question to be noticed is the newly discovered evidence. Was the letter of Spullock to Tumlin such material testimony as would probably have produced a different verdict. As a general principle we may remark, applications for new trials on account of newly discovered evidence, are not favored by the Courts of justice; and several things must concur to justify a new trial on this ground: First, that the evidence has come to his knowledge since the trial; second, diligence; third, materiality; fourth, that it is not cumulative; fifth, a new trial will not be granted to impeach a witness.

It appears from the testimony of Tumlin and Stegall and Spullock that the contract for a supply of water was separate and distinct, and the letter discovered may be true and yet not inconsistent with this evidence, and would not have changed the verdict of the jury thereon. We lay down as a proposition that where newly discovered evidence is reconcilable with the other proof in the case, a new trial will not be granted: 26*th Georgia*, 223. On motion for a new trial, if the newly discovered evidence will not change the result, or if there appears on the whole sufficient evidence to support the verdict, the Court will not interfere: Meade *vs.* Coustaus, Minnesota Reports, 171.

In the opinion we entertain of the facts of this case we feel satisfied that there is sufficient evidence, as to the contract for the supply of water, to sustain the verdict, and the admission of this letter is reconcilable and consistent with the facts testified to by the witnesses; and, besides, the only question raised by such proof would be to the effect that the plaintiffs were to have kept up a wood and water station at Stegall's, which would be cumulative of the testimony of Mr. Dooley, which would be no ground, by unbroken current of authorities, to have granted a new trial. The contract set up by Tumlin as made with Spullock, was to the effect that he, in connection with Stegall, were to supply water at Shanghai station, at the fixed compensation of one

dollar per day. He proved this by his own oath; Stegall proved it; Spullock proved it, and the fact itself of the building of the rams, the placing of the pipe and furnishing of the road at that point with water for two years, proved it. Superadded to this, the railroad built a tank at the station. And all this proof, grouped together, made such a mass of incontrovertible evidence as demonstrates its truth, and outside of all other considerations, upon the testimony submitted to the jury and the refusal of the Judge below to grant a new trial, we do not think that there is sufficient in this case to invoke from us a reversal of that judgment.

Judgment affirmed.