73966. ROME HOUSING AUTHORITY v. ALLIED BUILDING
MATERIALS, INC. et al.
73967. ALLIED BUILDING MATERIALS, INC. et al. v. DOUBLE
DIAMOND CONSTRUCTION COMPANY OF TENNESSEE,
INC. et al.
(355 SE2d 747)

Banke, Presiding Judge.

This litigation arose from a dispute among the owner, the contractor, and one of the subcontractors involved in the construction of a public housing project. On October 28, 1983, Allied Building Materials, Inc. d/b/a Allied Construction Company (hereinafter "Allied" or "the contractor"), contracted with the Housing Authority of the City of Rome (hereinafter "the housing authority") to build the housing units for the fixed sum of $2,800,900. On that same date, Double Diamond Construction Company of Tennessee, Inc. (hereinafter "Double Diamond" or "the subcontractor"), subcontracted with Allied to perform the necessary excavation, grading, and storm sewer installation work on the project for the total price of $305,000. While engaged in the performance of its excavation and grading work, Double Diamond encountered a substantial quantity of subsurface rock, the removal of which was not provided for by the contract specifications governing the project.

Article 9 of the contract between Allied and the housing authority provided, in pertinent part, as follows: "b. Should the contractor encounter subsurface or latent conditions at the site materially differing from those provided for in this contract, . . . he shall promptly, and before such conditions are disturbed, notify the [housing authority] in writing. They (sic) shall cause the architect to investigate such conditions and if they do materially differ, make such changes in the drawings and specifications as the architect may find necessary. c. Any discrepancies which may be discovered between actual conditions and those represented by the topographical maps and plans shall be reported to the [housing authority] at once, and *the work shall not proceed, except at the contractor's risk, until written instructions have been received by him*." (Emphasis supplied.)

Similarly, Article 8 of the contract, which authorized the housing authority to order changes in the work, specified as follows: "b. Except in an emergency endangering life or property, *no changes shall*

*be made by the contractor unless he has received a prior written order from the [housing authority] . . . authorizing the change.* [Emphasis supplied.] Any change in the work shall be ordered and the adjustment of the contract price or time shall be determined by one of the following methods: *Method 1 — Adjustment before performance.* By issuance of a change order providing for an agreed lump-sum adjustment . . . *Method 2 — Adjustment after performance.* By prior issuance of a proceed order, authorizing the contractor to proceed with the change by the most economical method. If net extra cost is anticipated, such order shall state the maximum sum, including all items of overhead and profit. If such sum is exhausted prior to the completion of the change, the contractor shall not proceed with the work without an additional and separate proceed order . . ."

Double Diamond encountered the subsurface rock on January 31, 1984. On February 2, 1984, Allied notified the housing authority in writing of the existence of the rock and requested that appropriate action be taken to procure its removal. The housing authority responded by instructing Allied to expose the subsurface rock to determine the extent of the problem, and this was subsequently done by Double Diamond at Allied's direction. Negotiations then ensued between Allied and the housing authority to reach agreement on a unit cost for the removal of the rock. In the meantime, Double Diamond continued to perform excavation and grading work at other locations on the job site, encountering other subsurface rock as it did so. At Allied's express direction, Double Diamond also engaged in some blasting and rock removal work, using special equipment leased for that purpose. However, because Allied never received an anticipated written change order from the housing authority authorizing such additional work, these latter activities were soon discontinued.

By mid-April, Double Diamond had reached a point where, it contends, further excavation and grading work was not possible until the subsurface rock was removed. On April 23, 1984, Allied notified the housing authority in writing that the presence of subsurface rock had stopped work on the project and requested "an immediate decision on the course of action you want us to follow in the performance of this work." In early May of 1985, Allied and the housing authority finally agreed on a unit price for the removal of the rock; however, a new disagreement then arose over the extent to which Allied was entitled to be compensated for its additional expenses incurred to that point as a result of the delay in securing the rock's removal. In mid-May, both Allied and Double Diamond removed their equipment from the job site; and on June 14, 1984, Allied filed suit against the housing authority seeking a declaration that it was in breach of the construction contract. The housing authority, in turn, filed a counterclaim charging that Allied had breached the contract, impleading as

an additional defendant-in-counterclaim the surety on Allied's payment and performance bond, Fireman's Insurance Company of Newark, New Jersey.

By consent of the parties, the issues of whether the contract had been breached and by whom were tried before the court without a jury. In an order entered on August 21, 1984, the trial court concluded that "neither party [had] moved with any promptness in attempting to resolve their disputes nor in utilizing the provisions of the contract which provide for the handling of disputes." Although the court further determined that "the contractor may well have been unreasonably delayed by the failure of [the housing authority] to promptly move on the issue of the removal of the rock and the issuance of the necessary change orders or proceed order," the court concluded that such delay did not "at the present time" authorize Allied to treat the contract as terminated and to abandon work on the project. The court gave the housing authority an additional 30 days to resolve the rock issue, "either by issuing a supplemental contract to a third party for the removal of the rock or issuing such instructions to the contractor so that it may proceed with the rock removal and the completion of the project." The issue of whether and to what extent Allied was entitled to recover delay damages was reserved for determination at a later date "in accordance with the contract provisions."

At a subsequent meeting between the parties held on September 4, 1986, Allied notified the housing authority that it estimated the cost of removing the subsurface rock to be approximately $1,000,000. On September 18, 1984, the housing authority forwarded to Allied a change order authorizing payment of some rock removal costs as well as some "remobilization" costs. While objecting to certain aspects of this change order, Allied made arrangements to commence the removal of the rock. However, on October 5, 1984, the housing authority verbally, and subsequently in writing, issued a stop-work order prohibiting Allied from removing any rock in the particular location where it was prepared to do so. Based on the issuance of this stop-work order, the trial court, on November 7, 1984, declared the housing authority to be in material breach of the contract, reserving the issue of damages for trial by jury at a later date. Allied thereafter notified Double Diamond that, due to the housing authority's termination of the main contract, it considered their subcontract also to be terminated.

On February 24, 1985, Double Diamond filed suit against Allied and its surety, Fireman's Insurance, to recover damages for the breach of the subcontract. Specifically, Double Diamond sought to recover (1) its unrealized anticipated profits allegedly lost as a result of the termination of the contract and (2) its unanticipated additional expenses incurred as a result of the delays caused by the rock prob-

lem. Allied then filed a third-party complaint against the housing authority, seeking to be indemnified for any damages which it might be required to pay Double Diamond. By agreement of the parties, Double Diamond's suit against Allied was consolidated for trial with the already pending litigation between Allied and the housing authority, as to which only the issue of damages remained. By further agreement of the parties, the issue of the housing authority's liability to Allied on the third-party complaint was reserved for determination by the trial court without a jury, following resolution of the other remaining issues in the case.

The jury returned a verdict in favor of Double Diamond on its claim against Allied and Fireman's Insurance, awarding it $46,315 for its additional expenses resulting from the "unreasonable delay" in resolving the rock problem and $33,338 for its lost profits resulting from the termination of the subcontract. The issue of the amount of damages suffered by Allied as a result of the housing authority's breach of the main contract was submitted to the court for resolution without a jury, resulting in a judgment in favor of Allied in the amount of $352,751. Thereafter, based on a determination that the housing authority was equally responsible with Allied for Double Diamond's delay damages, the trial court awarded Allied $23,157.50 on its third-party complaint, i.e., one-half the total amount of delay damages which the jury had awarded to Double Diamond. The housing authority, but not Allied, subsequently filed a motion for new trial. This motion was denied, and within 30 days thereafter both Allied and the housing authority filed notices of appeal. Double Diamond has moved to dismiss Allied's appeal on the ground that it was not filed within 30 days of the entry of the judgment appealed from. *Held*:

1. The motion to dismiss Allied's appeal is denied. In *Smith v. Smith*, 128 Ga. App. 29 (2) (195 SE2d 269) (1973), this court held that a defendant in a civil action against whom judgment has been entered is not entitled to file an appeal during the pendency of a motion for new trial filed by a third-party defendant. Accord *Dept. of Transp. v. Rudeseal*, 148 Ga. App. 179 (1) (251 SE2d 11) (1978). Thus, Allied's right to appeal the judgment entered on the jury's verdict did not accrue until the housing authority's motion for new trial was denied, with the result that Allied's notice of appeal was timely filed.

2. The housing authority contends that Double Diamond was not authorized to sue on the subcontract because prior to trial it had executed an assignment conveying to a bank, as security for an indebtedness, its right "to receive the proceeds or property payable by reason of [its] performance" under the subcontract, including "any judgment or settlement proceeds" obtained as a result of the present litigation.

This contention is without merit for two reasons. In the first place, the document in question did not purport to be an assignment of the subcontract itself, i.e., it did not authorize the bank to pursue in its own name claims or choses in action arising under the subcontract. See generally OCGA § 44-12-22. Rather, it merely authorized the bank to "receive" the contract proceeds payable to Double Diamond, including specifically any proceeds which might be recovered by Double Diamond in the present action. Compare *William Iselin & Co. v. Davis*, 157 Ga. App. 739, 741 (278 SE2d 442) (1981); *Rigdon v. Walker Sales & Svc.*, 161 Ga. App. 459, 462 (288 SE2d 711) (1982). Secondly, because the housing authority first raised this issue in its motion for new trial, the objection must be deemed waived in any event. "[A] real-party-in-interest objection is similar to the defense of failure to join an indispensable party under [OCGA § 9-11-19] and may be made at any time up to and including a trial on the merits. [Cits.]" *Rigdon v. Walker Sales & Svc.*, supra at 462.

3. The trial court was authorized to conclude from the evidence that the housing authority had materially breached the construction contract by preventing Allied from completing its performance thereunder, first by waiting almost eight months after receiving notice of the existence of the rock problem to issue a written change order to Allied directing the removal of the rock, and then by issuing the stop-work order after a written change order was finally issued. The question of whether there was other work that Allied could have engaged in pending resolution of the dispute over the rock removal was clearly taken into consideration by the trial court and was resolved in Allied's favor as an issue of fact.

The housing authority's reliance on *Decatur County v. Praytor, Howton &c. Co.*, 165 Ga. 742 (142 SE 73) (1927), as authority for a contrary result is misplaced. Unlike the contract in the present case, the contract at issue in *Decatur County v. Praytor* specified a method for calculating the additional amounts which were to be paid to the contractor in the event additional work was necessitated by variances between the topographical conditions existing at the job site and those anticipated by the bid documents. Moreover, there was no contention in that case that the owner had hindered the contractor's performance of the contract by failing to issue required change or proceed orders. Similarly, in *State Hwy. Dept. v. Hewitt Contracting Co.*, 113 Ga. App. 685 (149 SE2d 499) (1966), the issue was not whether the owner had prevented the contractor from performing the work required by the contract but whether the contractor, who had proceeded with the performance of certain additional work, had complied with its contractual obligation to give written notice of its intention to claim additional compensation for such work.

4. Allied contends that Double Diamond's separate recovery of

its alleged expenses incurred as a result of the delays in resolving the rock problem was violative of the standard of recovery set forth in *Williams v. Kerns,* 153 Ga. App. 259 (265 SE2d 605) (1980). In that case, this court held that the damages recoverable by a contractor for the owner's breach of a fixed-price construction contract consist of the net profit which the contractor would have received had full performance of the contract been permitted, to be calculated as follows: "That figure is reached by subtracting from the contract price the amount which full performance would have cost the contractor. If performance by either party had begun prior to the breach, adjustments must be made to ensure that the contractor receives the full amount of the profit, but no more. First, there must be added to the profit figure the amount of the contractor's net loss up to the point of the breach. . . . The sum of those figures (the profit which would have been realized from full performance plus net loss incurred by performance to the date of breach) may in no event exceed the contract price. Second, there must be deducted from the recovery those amounts received by the contractor from the owner as prepayment or progress payment." Id. at 266-267.

It is quite clear from an examination of the transcript that the jury's award of lost profits to Double Diamond was in complete accordance with the above formula in that it represented the anticipated net profit which Double Diamond would have realized had it been able to complete its performance of the subcontract, plus the expenses which it had actually incurred towards that end up to the date of the breach, minus all progress payments received from Allied. The additional recovery of delay damages in the amount of $46,315 was in no way duplicative of that award but represented the additional expenses Double Diamond had incurred in performing the blasting and rock removal work ordered by Allied and in maintaining its earth-moving and rock-drilling equipment idle at the project site for several weeks at the specific directive of Allied, pending a resolution of the dispute between Allied and the housing authority. Evidently because these additional expenses were not contemplated by the terms of the written subcontract, they were not included by Double Diamond in its calculation of its lost profits but were sought as a separate element of damages. Since these additional expenses were incurred at Allied's express direction and for its benefit, we can conceive of no reason why their recovery should not be allowed. Accordingly, we hold that the trial court did not err in denying Allied's motion for directed verdict with respect to this element of damages.

5. Allied contends that the trial court contradicted itself by ruling that it (Allied) was equally responsible with the housing authority for Double Diamond's delay damages while simultaneously ruling that, as between Allied and the housing authority, the housing au-

thority was the party responsible for terminating the contract. This contention is also without merit. While it is true that the trial court attributed the ultimate breach of the contract to the housing authority's issuance of the stop-work order, it was not the ultimate breach of the contract which gave rise to Double Diamond's claim for delay damages. Rather, those damages were attributable to the additional costs incurred by Double Diamond as a result of the joint failure of Allied and the housing authority to move, in the words of the court, "with any promptness in attempting to resolve their disputes [or] in utilizing the provisions of the contract" to prevent the work from coming up to a halt. As there is evidence to support such a joint assessment of blame, we hold that the trial court was authorized to apportion the delay damages in question equally between these two parties.

6. The remaining enumerations of error have been determined to be without merit for the reasons set forth above.

*Judgment affirmed. Carley and Benham, JJ., concur.*

DECIDED MARCH 18, 1987.

*Walter J. Matthews*, for Housing Authority.
*John T. Flynn, Frederick L. Wright, Edward Hine, Jr.*, for Allied and Fireman's Insurance.
*William T. Alt*, for Double Diamond.